```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
GENE CODES FORENSICS, INC.,

                        Plaintiff,
                                              MEMORANDUM AND ORDER
         - against -
                                              10 Civ. 1641 (NRB)
THE CITY OF NEW YORK,

                        Defendant.
----------------------------------------X
```
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Gene Codes Forensics, Inc. ("Gene Codes") initiated this diversity action against the City of New York (the "City"), asserting claims for, inter alia, breach of contract. The City counterclaimed for breach of contract, asserting that the parties' agreement entitled it to royalty-free, perpetual updates of Gene Codes' software.[1] In a June 24, 2011 opinion, we dismissed Gene Codes' claims against the City in their entirety. See Gene Codes Forensics, Inc. v. City of New York, 812 F. Supp. 2d 295 (S.D.N.Y. 2011). Presently before us is Gene Codes' motion to dismiss or, in the alternative, for summary judgment on the City's counterclaim against it.

---

[1] The City initially brought additional counterclaims for unjust enrichment and breach of release and covenant not to sue but abandoned them in an amended counterclaim filed during briefing on this motion. We recognize that the amended counterclaim was not filed within the 21-day period provided by Federal Rule of Civil Procedure 15(a)(1)(B) and that the City did not request leave to file the amendment. We nevertheless use our discretion to accept the Amended Counterclaim and treat Gene Codes' motion as applicable to it.

1

For the reasons set forth herein, Gene Codes' motion is granted.

## BACKGROUND[2]

After the attack on the World Trade Center on September 11, 2001, the Office of Chief Medical Examiner ("OCME"), a City agency, began searching for a means by which to identify the remains of the victims. On or about September 29, 2001, Gene Codes approached OCME with an offer to provide its services. The City had been using one of Gene Codes' programs known as "Sequencher" to match nuclear DNA from crime scene remains to nuclear DNA exemplars from family members in order to establish identity, and Gene Codes proposed that the program could be modified to work with mitochondrial DNA and new software -- referred to as "middleware" -- developed to work in connection with various other technologies. This middleware -- which eventually came to be known as the "Mass Fatality Identification System," or "M-FISys" -- compares DNA data profiles collected from different sources in order to identify remains. It thus requires a database to store relevant DNA profiles, which database needs to be updated as new remains are discovered or comparators identified.

---

[2] These facts are derived from Defendant's Amended Counterclaim and the documents attached to it or otherwise incorporated by reference therein. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

On or about March 1, 2002, Gene Codes and OCME entered into an agreement (Def.'s Am. Counterclaim, Ex. A (the "License Agreement")) that provides, in part, for further use of the Sequencher program. That agreement gives OCME a license to use Sequencher "for the term of the contract,"[3] while Gene Codes retained proprietary rights in the program. (License Agreement ¶ V(A).) It expands on the grant of the license by providing that OCME is "entitl[ed] . . . to use the existing 'Sequencher' program and any modifications of Sequencher as necessary for its purposes during the term of this contract." (Id. ¶ VII(B).) OCME was, however, required to resume paying licensing fees for use of Sequencher "[a]t the termination of the agreement." (Id.)

OCME's use of Sequencher notwithstanding, the agency required "adequate software to allow accurate comparisons between DNA profiles and family exemplars" on a large scale, which software "does not exist and must be created." (Id. ¶ II(C)(3)(b).) Therefore, Gene Codes was obligated to "build middleware . . . between existing OCME software and Sequencher." (Id. ¶ V(B).) The parties' rights in that middleware are governed by the following paragraph:

> In the course of performing the services under this agreement, [Gene Codes] shall create source code for

---

[3] The License Agreement initially spanned a term of three years, applying retroactively to September 12, 2001 and terminating on September 11, 2004. (License Agreement ¶ IV(B).) In April of 2006, however, the term of the contract was extended to September 30, 2004 in order "to provide for a continuation of services." (Id., Second Amendment 1.)

3

>     middleware which will link the various databases
>     mentioned in this Paragraph VII, may create entirely
>     new software and databases, and may create
>     modifications of its proprietary product "Sequencher."
>     All such middleware, new software, and modifications
>     of Sequencher shall be the exclusive intellectual
>     property of [Gene Codes], although [Gene Codes] shall
>     grant to the OCME a non-exclusive, royalty free,
>     perpetual license to use the middleware and software
>     so created for non-commercial purposes. The extent of
>     the OCME's rights to use modifications of the
>     proprietary program[] "Sequencher" is described in
>     Subparagraph B.

(Id. ¶ VII(D).)

The License Agreement also recited Gene Codes' representation that "all source code and related documentation for the software and middleware which is the subject of this agreement is under escrow deposit . . . or shall be so deposited as new software and middleware is created." (Id. ¶ XVIII(A).) In the event that Gene Codes became insolvent, ceased to exist, or failed to perform its obligations under the License Agreement, the escrow agent was "to provide the City with a copy of the source code and commentary for the installed release level of the product utilized by the City." (Id. ¶ XVIII(A)(5).) Gene Codes certified that it had "deposited and hereafter will maintain[] a current copy of all source code related to the software and middleware, including current commentary, with the escrow agent," and it further agreed "to adhere to obligations set forth in the agreement between the escrow agent and [Gene Codes]." (Id. ¶ XVIII(B).)

4

That agreement (Def.'s Am. Counterclaim, Ex. B (the "Escrow Agreement")), entered into on July 2, 2002, recites that Gene Codes had "agreed to deposit in escrow a copy of the source code form of the computer program . . . included in the Software System covered by the License Agreement, as well as any corrections or enhancements to such source code." (Escrow Agreement 1.) Specifically, Gene Codes agreed "to deposit with Escrow Agent, at such times as they are issued, a copy of all revisions to the Source Code or Commentary encompassing all corrections or enhancements made to the Software by [Gene Codes] pursuant to the License Agreement." (Id. ¶ 1.) The Escrow Agreement is to renew perpetually until the source code is delivered to OCME. (Id. ¶ 2.)

Gene Codes delivered the first operating version of M-FISys to OCME in December 2001. Subsequently, OCME supplied feedback to Gene Codes and specified certain features it wanted included in future iterations of the software, and Gene Codes provided more than seventy M-FISys upgrades and revisions to OCME. None of these versions of M-FISys contained a user function that would have enabled OCME personnel to create new databases or load DNA profiles into an existing database. Rather, Gene Codes itself created a database in which to store the DNA data profiles related to the World Trade Center victims and loaded new profiles into that database for OCME. After the expiration

of the contract term, Gene Codes added a function to M-FISys that enabled users to add DNA profiles to databases without assistance from Gene Codes.

Gene Codes released version 7.11 of the software on or about September 9, 2004 and provided it to OCME. After the expiration of the contract term, the parties engaged in discussions concerning a new agreement to make further improvements to M-FISys desired by OCME, but no such agreement was ever completed. Gene Codes nevertheless continued to develop and release new versions of M-FISys, but OCME has not received any of these releases; rather, Gene Codes has marketed them to other customers. Gene Codes deposited updated source code in escrow in 2005 and 2006, but it has since stopped depositing source code revisions.

On March 1, 2010, Gene Codes filed suit against the City alleging, inter alia, that the City had breached the License Agreement by inappropriately dispersing confidential information obtained pursuant to that agreement. The City counterclaimed on April 26, 2010, asserting that Gene Codes had itself breached the License and Escrow Agreements. On June 24, 2011, this Court granted summary judgment on Gene Codes' claims in favor of the City. Thereafter, on October 19, 2011, Gene Codes moved to dismiss the counterclaims against it. On November 28, 2011, the City filed its opposition to the motion as well as an amended

counterclaim, which abandons many of the claims in the original counterclaim and seeks only for Gene Codes (1) to supply the City with all upgrades to M-FISys since the expiration of the term of the License Agreement and on into perpetuity, and (2) to deposit the M-FISys source code for each such upgrade into escrow.

For the reasons below, we grant Gene Codes' motion to dismiss the counterclaim.

## DISCUSSION

### I.  Legal Standards

When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12 (b) (6) of the Federal Rules of Civil Procedure, a court must accept as true all well-pleaded allegations and draw all reasonable inferences in a non-movant's favor. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). Mere "conclusions of law or unwarranted deductions of fact," however, need not be accepted as true. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (internal quotation marks omitted). At this stage in a breach of contract action, if the allegations "are flatly contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference." Taussig v. Clipper Grp., L.P., 787 N.Y.S.2d 10, 11 (1st Dep't 2004), quoted in Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.,

244 F.R.D. 204, 213 (S.D.N.Y. 2007). Under these standards, a pleading must include "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## II. Whether Gene Codes Has Breached the Agreements

There is no dispute that Gene Codes and the City entered into a valid contract and that the City paid Gene Codes what it was obligated to under the License Agreement. The controversy hinges on whether Gene Codes has met its own obligations to the City, i.e., whether the License Agreement required Gene Codes to provide the City with updates to M-FISys even after the expiration of the contract term.[4]

### A.   Rules of Contract Interpretation

If a contract is unambiguous, its interpretation is a question of law to be addressed by the Court. See Provident Loan Soc'y of N.Y. v. 190 E. 72nd St. Corp., 911 N.Y.S.2d 308, 309 (1st Dep't 2010). A contract is ambiguous only if "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Goldman Sachs Grp., Inc. v. Almah LLC, 924 N.Y.S.2d

---

[4] Gene Codes argues that because the License Agreement provides that payment by OCME to Gene Codes "shall be made only upon certification by [OCME] that the work represented by the invoice has been satisfactorily completed in accordance with the terms and conditions of the agreement," (License Agreement ¶ XI), the fact that Gene Codes was paid by OCME establishes that Gene Codes has fulfilled its obligations. The City, however, is arguing that Gene Codes owes it a service in perpetuity for which no payment is required. By definition, no invoice would need to be generated.

8

87, 90 (1st Dep't 2011) (internal quotation marks omitted); see also World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) ("[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (internal quotation marks omitted)).

In determining the meaning of a contract, we should "look to all corners of the document rather than view sentences or clauses in isolation,"[5] Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 99 (2d Cir. 1989) (internal quotation marks omitted); see also Kass v. Kass, 91 N.Y.2d 554, 566 (1998), and "accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish," Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006) (internal quotation marks omitted); W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced to its

---

[5] In this context, the License and Escrow Agreements should be treated as a unified document. See Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 52-53 (2d Cir. 1993) (holding that, even if documents are not executed simultaneously, so long as they relate to the same transaction and nothing indicates an intention to the contrary, the documents should be interpreted together).

9

terms."). In other words, our "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." Bolt Elec., Inc. v. City of New York, 223 F.3d 146, 150 (2d Cir. 2000); see also Goldman Sachs Grp., 924 N.Y.S.2d at 90 (requiring "a practical interpretation [of] the language employed," paying heed to "the parties' reasonable expectations" (internal quotation marks omitted)).

**B. Interpretation of the Agreements**

1. The Parties' Interpretations

Gene Codes contends that the License Agreement provides only that OCME is entitled to receive versions of M-FISys created during the term of the contract, though it may continue to use those versions without end. In support of its interpretation, Gene Codes points to the language in the License Agreement surrounding the grant of the "perpetual license." In particular, Gene Codes notes that that paragraph refers only to software created "[i]n the course of performing the services under this Agreement." (License Agreement ¶ VII(D).) It is undisputed that, by its terms, the License Agreement expired in 2004, and accordingly, Gene Codes contends, the grant of a perpetual license to use "such middleware" and "software so created" must be a grant to use the versions of M-FISys created in September 2004 or earlier, not later versions.

The City argues that Gene Codes ignores relevant language in the License and the Escrow Agreements. The City refers specifically to wording that requires Gene Codes to deposit in escrow "all updates" and "all revisions" of the source code (id. ¶ XVIII(A)(2), (3); Escrow Agreement ¶ 1); because this language is not limited to middleware created during the three-year term, the City Contends, Gene Codes' limited reading of the perpetual license provision is inappropriate. The City also suggests that Gene Codes' obligation to "maintain[] a current copy of all source code related to the software and middleware, including current commentary," (License Agreement ¶ XVIII(B)), requires it to keep the source code up to date even after the expiry of the License Agreement.[6]

2.  The Court's Reading

Simply because the parties offer differing constructions of the License Agreement does not mean that it is ambiguous. See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010); Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd., 88 N.Y.2d 347, 352 (1996). Indeed, read in its

---

[6] The parties essentially agree that the escrow provision of the License Agreement -- that, upon one of the specified conditions, the City is to be provided with "a copy of the source code and commentary for the installed release level of the product utilized by the City" (License Agreement ¶ XVIII(A)(5)) -- requires that the City be provided with the source code for the latest version of M-FISys to which it is entitled under the rest of the License Agreement. Thus, if Gene Codes' interpretation is the correct one, the source code for version 7.11 must be held in escrow; on the other hand, if the City is correct, Gene Codes must continually update the source code to the latest version.

11

entirety, even in connection with the Escrow Agreement, the License Agreement evinces a clear intent only that the City be permitted to use in perpetuity the versions of M-FISys provided to it during the contract's term, not that the City be given any and all versions of M-FISys created after the expiration of the License Agreement at no cost.

A plain reading of the paragraph that grants OCME "a non-exclusive, royalty free, perpetual license to use the middleware" indicates that only software created during the term of the contract was contemplated as part of the grant. (License Agreement ¶ VII(D).) That paragraph begins by noting that Gene Codes will create middleware "[i]n the course of performing the services under this agreement." (Id.) The next sentence, the operative one, indicates that "[a]ll such middleware" -- i.e., that which is created by Gene Codes pursuant to the agreement -- will be Gene Codes' intellectual property but available for use by OCME in perpetuity. (Id.) Thus, it is only if the License Agreement obligates Gene Codes to continue creating versions of M-FISys after it expires that OCME would have any right to those later versions.[7]

---

[7] We note that this interpretation is consonant with New York case law, which has found perpetual obligations only when contract language is clear. See, e.g., Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008) ("[U]nder New York law, . . . [i]n the absence of a clear provision, courts are reluctant to declare a perpetual license as a matter of law." (internal quotation marks, citation, and alteration omitted)); Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co., 607 F. Supp. 2d 600, 603 (S.D.N.Y.

The section of the License Agreement entitled "Obligations of the Vendor" does not refer to any obligations that temporally extend beyond the term provided in the contract. (Id. ¶ V.) Nor does any other provision. Perhaps recognizing this difficulty, the City contends that the fundamental importance to M-FISys of a feature that enables OCME to create new databases and directly upload DNA profiles creates an implicit obligation on Gene Codes to ensure that the City is provided a version of the middleware with such a function.

We disagree that the lack of such a feature in the City's version of M-FISys "makes the perpetual license granted to OCME meaningless and defeats the purpose of the contract," and that the program is "worthless" without it. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. to Dismiss Counterclaims or, Alternatively, for Summ. J. 17-18.) The versions of M-FISys that OCME used throughout the duration of the contract term did not have that feature, yet they were certainly still of value to the agency. That value may have been attributable in part to Gene Codes' provision of an additional service by creating databases and uploading DNA profiles for OCME. Nonetheless, after the

---

2009) ("[I]f the parties to a contract intend for it to be perpetual, they must expressly say so." (citing cases)). Accordingly, even though the License Agreement does grant some perpetual rights, it should not be construed to extend those rights to property not clearly contemplated by the license. Cf. Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 455-56 (2007) (holding that the presumption against extraterritorial application of a statute remains instructive to inform the extent of that application when a statute explicitly applies extraterritorially).

13

expiration of the contract term, the City could continue to pay Gene Codes, or potentially even another provider, to perform that service, so M-FISys would continue to be useful. The perpetual license has value insofar as the City is not required to pay Gene Codes licensing fees for the program's use in such a scenario, as is the case if it wishes to continue using Sequencher. (License Agreement ¶ VII(B).)

More importantly, however, we are empowered only to articulate the obligations actually contained within the License Agreement, not "to 'supply a specific obligation the parties themselves did not spell out.'" Manhattan Motorcars, 244 F.R.D. at 213 (quoting Tonking v. Port Auth. of N.Y. & N.J., 3 N.Y.3d 486, 490 (2004)). Had the existence of the desired feature been of paramount importance, it would have been the subject of a term of the License Agreement.[8] It was not, and we cannot now imply it.

Gene Codes was thus not obligated to continue upgrading M-FISys after the License Agreement expired, and it therefore had no obligation to provide the City with use of any versions of M-FISys it later created.[9] The language pertaining to the escrow

---

[8] The License Agreement expressly provides nine different features that the software developed by Gene Codes must have. (License Agreement ¶ V(B)(4)(a)-(i).) That list does not include the ability for OCME employees to create databases and import DNA profiles.

[9] This conclusion is supported by industry practice. See Software AG, Inc. v. Consist Software Solutions, Inc., No. 08 Civ. 389, 2008 U.S. Dist. LEXIS 19347, at *20 (S.D.N.Y. Feb. 21, 2008) ("The concept of a 'perpetual'

14

does not change this analysis. The escrow provision in the License Agreement continues referring only to "all source code and related documentation for the software and middleware which is the subject of this agreement." (License Agreement ¶ XVIII(A).) The fact that such material must be deposited "as new software and middleware is created" does not imply that the obligation continues beyond the term of the contract; the middleware that is contemplated in that phrase is still the middleware "which is the subject of this agreement." (Id.) The subsequent paragraph, which provides that Gene Codes has "certifie[d] that it has deposited and hereafter will maintain[] a current copy of all source code related to the software and middleware, including current commentary," (id. ¶ XVIII(B)) -- although it does not specifically reiterate that the middleware "is the subject of this agreement" -- should be read in the same way. The only software and middleware that has been referenced is that which is the subject of the License Agreement; to suddenly pivot and read the terms as referring to middleware which is not the subject of the License Agreement is indefensible and would render the limitation in the previous paragraph purposeless. Cf. Cragg v. Allstate Indem. Corp., 17

---

maintenance agreement is unknown in the computer software industry . . . ."); cf. World Trade Ctr. Props., 345 F.3d at 184 (finding relevant to the interpretation of a contract "the customs, practices, usages and terminology as generally understood in the particular trade or business").

15

N.Y.3d 118, 122 (2011) (noting that an interpretation should not make a portion of a provision meaningless).

The language in the Escrow Agreement must be read in a similar fashion.[10] The third "Whereas" clause makes clear that the Escrow Agreement refers only to "the source code form of the computer program (the 'Software') included in the Software System <u>covered by the License Agreement</u>, as well as any corrections or enhancements to such source code."[11] (Escrow Agreement at 1 (emphasis added).) And the substantive provision of the agreement obligates Gene Codes only to deposit in escrow "a copy of all revisions to the Source Code or Commentary encompassing all corrections or enhancements made to the Software by [Gene Codes] <u>pursuant to the License Agreement</u>." (Escrow Agreement ¶ 1 (emphasis added).) Once again, updates Gene Codes makes to M-FISys but is not obligated to make under the License Agreement are not covered.

The documents are consistent and unambiguous in their expression of the parties' intentions. Reading them as one integrated instrument, it is evident that Gene Codes had no

---

[10] We note that, even were the agreements in conflict (which we do not believe they are), the License Agreement indicates that the Escrow Agreement "provides materially the same terms and conditions" as those contained in the License Agreement, (License Agreement ¶ XVIII(A)), and that, to the extent there is "a conflict between the incorporated attachments and this contiguous document, this contiguous document shall control," (<u>id.</u> ¶ XXVI(J)).

[11] The City's emphasis on "any corrections or enhancements to such source code" is simply distorting. The language neither purports to create a substantive obligation nor conflicts with our prior analysis when read in full context.

16

obligation to update M-FISys after the term of the License Agreement. Gene Codes' obligation was limited to the delivery to the City of a version of the middleware that met the requirements in the License Agreement. The License and Escrow Agreements further obligate Gene Codes to maintain in escrow a copy of the source code and relevant documentation for the version of M-FISys contemplated by the License Agreement until that material is delivered to the City. The City, under the License Agreement, has the right to continue using that version of M-FISys, without paying licensing fees, in perpetuity. It does not, however, have the right to further updates for which it has not paid.[12]

The City does not allege that it was supplied with an inadequate version of M-FISys, nor does it allege that Gene Codes has failed to keep in escrow the source code that is mandated by the agreements. The counterclaim thus does not state a claim for which the City is entitled to relief. Accordingly, it is dismissed.

---

[12] Although not necessary to our decision, we note that the City's actions counsel in favor of this conclusion. The parties participated in negotiations concerning further updates to M-FISys after the License Agreement terminated, but they were unable to come to amenable terms on "the scope of work or price for such an agreement." (Def.'s Am. Counterclaim ¶ 31.) Those negotiations, coupled with the City's failure to bring these claims until more than five years after the end of the term of the License Agreement, and then only after Gene Codes brought suit first for breach of contract, strongly suggest that the parties had been operating under the belief that the License Agreement did not provide the City with a perpetual right to M-FISys updates free of licensing fees. Cf. Goldman Sachs Grp., 924 N.Y.S.2d at 90 (noting the importance to contract interpretation of "the parties' reasonable expectations" (internal quotation marks omitted)).

17

## CONCLUSION

For the foregoing reasons, the motion (docket no. 45) is granted.

Dated:    New York, New York
          April 26, 2012

*[signature]*
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

**Attorneys for Plaintiff**
Laurence A. Levy, Esq.
Bracewell & Giuliani LLP
1251 Avenue of the Americas
New York, NY 10020-1104

J. Michael Huget, Esq.
Honigman Miller Schwartz and Cohen LLP
130 S. First Street, 4th Floor
Ann Arbor, MI 48104

**Attorney for Defendant**
Gerald E. Singleton, Esq.
Law Department
City of New York
100 Church Street
New York, NY 10007